Good morning, Your Honors. May it please the Court, Roxana Sandoval, Federal Defenders, on behalf of Mr. Vargas-Estudillo. I would like to reserve two minutes for rebuttal. Sure, I'll try to help you out, but keep an eye on the clock, please. Thank you, Your Honors. You know how this works? Yes. The Court should reverse because the government refused to turn over a list of eyewitnesses at the scene of the crime and destroyed video footage from the crime scene. Can we take the two separately? As to the first one, it's a discovery order? Yes, that's correct, Your Honor. So we review the judge's order for abuse of discretion? Yes, Your Honor, that is correct. When I look at the record here, I see that the judge just didn't deny the request, but said, well, government, if there was somebody close enough to hear a conversation, I'm going to order you to turn those over. And the officer declaration said nobody was within five or six feet of us and we didn't speak in the kind of way anybody could hear us. Given that record, no contradiction of that on the record, why did the judge abuse his discretion? The judge abused his discretion because the judge limited his focus primarily and only on what the witnesses could hear and not see. There were people in line waiting to be called at these booths, and so they were observing the actions. Well, make a proffer to us the way you would to the district court, because like Judge Horwitz, I'm struggling to see the materiality of the information that you're seeking because you're relying on essentially observations of his demeanor that would essentially corroborate his story in some way, correct? That is correct, yes. So what about his demeanor could the witnesses have observed that would have been helpful or material to your defense? The witnesses could have observed Mr. Vargas acting lost or confused at the port of entry, which is conduct that is consistent with someone that is not trying to reenter the United States, but instead conduct that is someone that is at the port of entry to ask for information. The witnesses could have also, in addition to corroborating- Drill down on that. How is acting lost or confused relate to what he said he was trying to do, which is to ask for information? Was there a proffer that he was, in fact, acting? Was there a declaration in the record that he acted lost? What specifics are you really arguing to the district court? And so there was no declaration at the motion hearing, but the specifics that were argued to the court were that the witnesses could have seen the interactions between my client and the agent at the- Go back to Judge Wynn's question because what you're saying is, well, it's possible that the witnesses might have seen him acting confused. And if he had a declaration in the record or some testimony that said, I was confused, I was in the wrong line, I meant- but he's got very good lawyers who say that's his defense. And I'm trying to figure out why the judge doesn't say, well, that's pretty speculative. Nobody tells me. There's no record that he was confused. The officer doesn't say so. He doesn't say so. So why am I going to put the government to the bother putting together a list of people who crossed at the same time, none of whom were within five or six feet of him, on the off chance that one of them may say he was confused? Why isn't that within the judge's wheelhouse of discretion in terms of discovery? Well, first addressing one of the first part of the question that the court had, there was some indication that Mr. Vargas was acting confused at the court of entry, and this information was before the court. When Mr. Vargas was-he was first called up to one booth, and then he was sent back, and he stood by a wall, and he wasn't standing in line, and so his conduct was- But the officer testified. There was testimony from the border patrol as to that. Yes, Your Honor. So what-I'm just trying to figure out-it might have been helpful. It might have been if some witness would have said he was confused, but we're talking about abuse of discretion here. And I know you want to get on to the destruction of the tape, but I think you've answered our question. There's nothing in the record from your client, a declaration, or some witness who says, and here's the reason why the names of these people might be helpful. No, Your Honor, there is no declaration. The only things that were in front of the court at the district court level was the facts that were proffered based on how Mr. Vargas was arrested and how he was acting. And the facts were that Mr. Vargas approached the first booth. The officer didn't remember what he said to Mr. Vargas but sent him away. Mr. Vargas then went, leaned against a wall. He didn't try to approach Officer Stone's booth. Officer Stone summoned him forward and then asked him these questions. Now, it seems to me that-and all you were asking for were the people who were there at 523 p.m. and the government wouldn't give it to you, but these people were witnesses to a crime or at least what the government was claiming was a crime. It does seem odd to me that the government wouldn't just give you these names. Exactly, Your Honor, and that's what we were requesting. We simply wanted to get the witness list so that we could interview the witnesses and conduct our own investigation before trial. And just two additional points about the witnesses. The witnesses could have also impeached Officer Stone's testimony, the government's key witness at trial, and the witnesses could have also led to a different defense strategy. How would they have impeached his testimony? His testimony was, I asked Mr. Vargas some questions and he gave me some answers. And since none of the witnesses were at a hearing distance, how would they have impeached his testimony? Your Honor, at trial, Officer Stone testified that when Mr. Vargas went up to his booth, he allegedly made a false statement and then looked into his bag while he was at the booth. And so a witness that was standing in line observing this interaction between Officer Stone and Mr. Vargas could have perhaps not seen him look into the bag. What difference would that make if the witness couldn't hear what the discussion was? And that was Officer Stone's declaration, that they were far enough away so that nobody else could hear our discussion. If I'm understanding the Court's question correctly, what difference would it make if they couldn't hear? Whether or not he looked in his bag or not. It would matter because Officer Stone implied that when Mr. Vargas looked into his bag, he was looking into his bag to look for his lawful permanent resident card. And so there was an argument that was being made that he looked into his bag for that reason. If a witness hadn't seen that interaction between Officer Stone and Mr. Vargas, we could have impeached Officer Stone at trial. You want to save some time for rebuttal? Yes, but one quick question before you get to the tape. So what's the correct procedure, if you're right, on the entitlement to the witness list? We basically send it back for you to conduct that discovery and gather sufficient evidence to support a motion for a new trial? Yes, Your Honor, that is correct. Not vacating the convictions? Not vacating the convictions. Just a limited remand to determine whether the evidence would have changed the verdict at trial. Do you want to address the video quickly? Yes, Your Honor, just very briefly. The video, the government destroyed the only video evidence of the crime scene. And even though Mr. Vargas specifically requested its preservation, and the government could have easily done so. What's the remedy? What's the remedy that you're seeking for that? We are requesting that the case be reversed and with the specific instruction that the case is dismissed. You're seeking dismissal of the indictment? That is correct, Your Honor, because the government acted in bad faith. Did you at trial seek an instruction, as often occurs to the jury, that the government destroyed or did away with this evidence, and therefore you can assume, jury, or presume if you want to, that it would have been helpful to the defense? We did not, Your Honor, at trial. We did not seek that remedy. And just one last point, since I am running out of time. I just would point the Court to that the government has acted in bad faith in two main ways by destroying this potentially useful evidence. The first way that the government has acted in bad faith is that they've engaged in a pattern in practice of destroying video footage from the Southern District. Even though the defense has specifically requested its preservation and the government could have easily done so, they're routinely recording over video footage after 30 to 45 days. We're familiar with the practice, so if you'd like to save the rest of your time, I'm sure the government will give an explanation of what the practice is down there. Yes, Your Honors, thank you. Good morning, Your Honors. May it please the Court, Colin McDonald on behalf of the United States. And I'll begin with that point, with the bad faith. Well, actually, could you begin? Yes, Your Honor. Why didn't you just give them the list of witnesses? That is a fair question, Your Honor, and... And let me double that question. We're here all the time on disputes that the government could have avoided quite easily to no great detriment to itself. Whether or not the judge abused his discretion is a separate issue. You've got the list. The government represents the judge. It's easily found. And for some reason, they resist like crazy the idea of giving it to the defendant. And that's why we're here. Why didn't you just give them the list? Answer Judge Eaton's question. Yes, and I understand the Court's concerns. I can speak to what the record reveals on this case in terms of the procedures that were in place and the requests that were made. It was a very heavily litigated case. And ultimately, with this particular discovery question, I think the district court ultimately reasonably handled it. But what's the big deal? That wasn't the question Judge Eaton asked you. What's the big deal? Your Honors, I don't know specifically the answer to that question in terms of the big deal that was sort of behind the scenes of the prosecutor on the front lines and the defense in terms of why they didn't... So you're coming in just to handle the appeal. You didn't handle the trial? That's correct, Your Honor. Did you speak to the trial AUSA about this question? I spoke about the case, certainly, and about the litigation. And I certainly had the trial AUSAs review the briefing, for instance, and check up on the facts and all of that. Yes, that did happen. See, I'm not sure your motivation makes any difference to our analysis of it, but it's frustrating. We have liberal discovery rules. They ask for something that's easily produced. It probably won't be helpful, in my view. And we have a long set of litigation about not producing it simply because the government can do that. And maybe the message you ought to bring back to the trial attorneys is  I understand, Your Honor. And with respect to the discovery question, the district court reasonably handled it by narrowing it. The request was a request for 15 minutes of witness, of people at the border beyond the defendant when he crossed, 15 minutes beyond that. And so the district court looked to see where's a reasonable zone of contact of people who may have heard, seen, or known any facts relevant to the discussion. Right, and I think that was a reasonable call by the district court, but the government resisted again. So the district court ordered them to go to Officer Stone and ask him, is there anybody within this reasonable zone of contact? So the USA didn't resist that. They did. They went to Officer Stone, and they said, we need more facts to determine whether there's someone within this reasonable zone of contact. And if there is, then we've got to turn that over. And then he said that Officer Stone said they were five to six feet away, which is, let's just say, double, half of what you and I are apart. So why wouldn't you just do it? Well, Your Honor, so one of the facts, I think this can be helpful, is on page 232 of the record, it shows the design of the pedestrian entry, and it shows the distance between, for instance, the Sentry Lane where Officer Stone was and where Vargas presented himself, and then the others in the queue line that are quite a ways back. And there's also walls, for instance, between the two lanes. Why does he say five or six feet then? I'm about five feet from Judge Eaton, and I can, even without the microphone, I suspect I could hear him. Yeah, I don't know specifically why he said five to six feet, but what he also said was a number of things, that no one was there when they were speaking. He also says that their conversation was quiet, it was not loud, it was not visible to anyone. But people can't act confused. If Mr. Vargas' argument is that he was confused, don't people act confused? Do they have to say that they're confused? They can. The problem here is that Vargas never said that he was confused. He said, people might have been able to see that I acted confused, but he himself never proffered. I was confused, and I was doing things that confused people do and that other people can notice. He didn't say I was standing against the wall scratching my head or somehow looking confused. He never said those things. Even at trial? Even at trial. So what evidence did the defense present at trial in support of their theory that he was confused and not really trying to cross the border? The only piece of evidence was a sworn statement from 1999, or from 2002 that referenced a petition that his father had filed in 1999 that the defendant never testified about it. Well, but there was more than that, wasn't there? Didn't Officer Ortiz also say that sometimes people do come to the booth to ask questions about immigration status? Correct. And Officer Ortiz said, I don't remember this guy. And he was also asked, if people kind of in a group come to your lane, do you ever wave them back without ever speaking to them? And he said, yes, I do. If there's a group that's sort of coming, and my understanding, or the facts show that Vargas was kind of hitched onto this other group approaching the adjacent lane, and as the facts are, Ortiz sort of waved him back. He did not recall if he said even a word to him, but he said that it would be his practice to wave people back. So then at that point he goes back and stands against the wall. He never proffers to the district court that he was confused or that he did anything to outwardly manifest his inner state of mind, which would have been noticeable to anyone at that court. Well, wouldn't there have been – if he waved these people back, isn't it likely that someone else would have noticed that they were being waved back? Well, there was only one person who was waved back. The rest of the group, as I understand it, the rest of the group proceeded. And by group, we don't know much about that group. Couldn't a witness have told you whether or not that was in fact the case? Wouldn't a witness have either supported this testimony or said the testimony wasn't true? And isn't it the case that the law is generally that you're entitled to evidence that would both help your case and hurt your case? So you know which way to proceed. What I would point the court to is the Little case, where this quote is directly from Little. Materiality is not established by a general description of the document sought or by a conclusory argument that the requested information was material to the defense. From Mandel also, neither a general description of the information sought nor conclusory allegations of materiality suffice. A defendant must present facts which would tend to show that the government is in possession of information helpful to the defense. These are eyewitnesses. This is not documentary evidence. These are eyewitnesses to a crime. Your Honor, my view of this crime is that it's not one that you sit up and take notice. It's not someone, you know, it's not an assault. It's not someone, you know, it's not one of those types of crimes. It's a crime that happened in a short, brief, quiet conversation. Well, the crime is a crime. The only crime for which this defendant was convicted was the attempt to cross the border. That's correct, Your Honor. He was not convicted for any false statement. That's correct, Your Honor. And so you've got somebody who's coming up to booths at the border. And his defense is, I'm coming there to ask questions. The government, as one government border agent says, people do that all the time. So it seems to me that his demeanor and what he was doing there might well be material to his defense. And if he had said that, if he had said, I was acting confused, like in Zaragoza, for instance, which is a different context. But is he required to do that to get discovery? Isn't it enough that the defense says, this is our theory of the case. We don't know whether we're going to put our client on or not. We have some evidence to support it because it's uncontested that his father had filed this application. We have some evidence to support it because one of the border patrol officers says people come there occasionally to ask questions about the status of their application. Given that, why isn't that enough? Do you really need a declaration from the defendant? I would say two things. One, he didn't actually say that he was at trial it came out that he was asking about this application. That was not part of the record before the court at the motion stage. No, but isn't that what the defense said their theory of the case was? Not at the motion stage. They said someone might be able to see this or might be able to see that. But he himself knew what his actions were at the port. If he had talked to someone, if he had been in line with someone and said, yeah, I was talking to someone for 15 minutes before, and I told him, I'm just coming up here to talk about the petition my father had filed for me. That could have been a fact. Well, if you hadn't destroyed the tape, would you have just handed over the tape? Would you have made the same argument with respect to the tape? If you hadn't destroyed the tape, would you have made the same argument with respect to the tape, no, we're not giving it to you because it doesn't have any sound? I think the United States wishes that the tape had been given over. No, no, answer my question. Would your argument have been, we're not going to give you the tape because it doesn't have any sound? No, no. Then why wouldn't you give them a list of the witnesses? Rule 16 requires that the defendant. I think the point is that if the tape had survived, if the government hadn't destroyed it, it would have shown his actions. And the witnesses also could have testified to his actions. So they're equivalent, I understand, to Eaton's point correctly. So if you don't fight the videotape, had it existed, why would you fight the witness list? The difference is that the video, that we don't know if any witnesses ever even saw him at the port. All right, but let's go back to Judge Eaton's question. I know we're taking you over time. Let's assume you had the videotape. It hadn't been destroyed. Yes. You surely would have had to produce it, wouldn't you? Yes, Your Honor. Given that you destroyed it, why not give them the second best thing, which is a list of witnesses? Why aren't you, under those circumstances, if you concede that you had to produce the videotape and you destroyed it, under those circumstances, and I don't mean you, I mean the government, under those circumstances, aren't you obligated to give them, in effect, the second best evidence, which is the list of witnesses? I think that would have been a good conclusion of these swirling issues. In terms of, I'm not aware of a rule that says if some mishap happens in one area of the case, that that then. Well, you don't think that the government's, and I don't think, it wasn't in bad faith. The judge found it wasn't in bad faith. But the government's destruction of evidence that you've been asked to preserve doesn't give rise to an obligation to at least give to the defendant the second best evidence of what he's seeking? I'm not aware of a case that would require that. Or a case the other way that says that we shouldn't take into account, when looking at the discovery motion, the government's destruction of evidence that it was asked to preserve? I'm not, I'm not. But these two motions operated independently, so they came independently. Let me ask you this, because I was on a panel not too long ago where we had discussions with an AUSA from your office about the practice of the video, and if I recall correctly, the panel expressed a lot of frustration with the practice of constantly overriding on these videos. And the AUSA had represented to me and to the other judges on that panel that that would be a discussion within your office. What, has there been a decision made in terms of how to handle this? Because we see this over and over again. Yes, Your Honor. There has been a lot of development on that side of things. And I'll note that this case has been around for quite a while. This was March 6th of 2015. This destruction occurred before our very, maybe simultaneous with one of them. Zaragoza came out March 18th. I think this was March 6th. Are you now routinely preserving these sort of video tapes? We are, Your Honor. So if this request was made now, the video would have been retained. So the time at the pedestrian port, they were retained for triple the time that they were back then. And there's also better lines of communication between the port and between the office. All right. We've taken you well over your time, but thank you for your argument. Thank you, Your Honor. I have two brief points. First, addressing the issue of the witness list. I think that the government took advantage of the fact that there was no other witnesses besides Officer Stone at trial. At closing, the government talked about how there was no other evidence to speak to Mr. Vargas' intent besides Officer Stone's testimony. And so the witnesses could have been helpful at trial. Same with the video footage. What do we make of the fact that the jury didn't convict your client on the false statement stuff? It seems to me the jury was able to take Officer Stone's testimony with a grain of salt, if you will, to the extent that you thought that you could argue that he wasn't being entirely accurate. The jury may have bought that. I don't know. At least one juror bought it. So what more could you have done with a witness who said he looked confused? At trial, Your Honor? Yes. Let's assume you had a witness who said, best I think you can get is a witness who said he looked confused. How does that change the result in this case? We could have used that witness to present that witness at trial to support our defense that Mr. Vargas didn't have the intent to reenter and used that witness's testimony at trial to support that defense. But we didn't have that opportunity. And the other point, Your Honor, that I wanted to make about addressing the issue of the destruction of video, I think that perhaps the government has been working to preserve video, but I think that it's still an ongoing issue in the Southern District. But the judge does make a finding that this wasn't done in bad faith. It was being done at the time routinely every 30 or 45 days. They shouldn't have done it, but you're not arguing that the judge's finding that it wasn't in bad faith was clearly erroneous, are you? We are, Your Honor, because the court was looking at the wrong thing and deciding whether there was bad faith. The court, again, incorrectly looked at the value of the video based on what people could see and hear from the video, or excuse me, hear from the video. And so I think that the court was looking at the wrong thing and deciding that there was no bad faith. All right. We've taken you over your time as well. We have the benefit of the briefing. I thank both sides for your argument. The matter is submitted for decision. Thank you.
judges: Nguyen, Hurwitz, Eaton